# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMY HARNISHFEGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-03035-TWP-DLP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| LOUIS LOPEZ in his official capacity as the | ) | |
| Indiana State Director for the AmeriCorps | ) | |
| VISTA Program and his individual capacity, | ) | |
| EMILY KUBISZEWSKI in her official capacity | ) | |
| as Program Officer for the AmeriCorps VISTA | ) | |
| Program and her individual capacity, and | ) | |
| COL. LISA KOPCZYNSKI in her official | ) | |
| capacity as Family Programs Director of the | ) | |
| Indiana National Guard and in her individual | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON PENDING MOTIONS

This matter is before the Court on a Motion to Dismiss filed by Defendants, Louis Lopez

("Lopez"), Emily Kubiszewski ("Kubiszewski") and Col. Lisa Kopczynski ("Kopczynski")

(collectively, the "Individual Defendants") (Filing No. 20); and a Motion to Dismiss, or in the

Alternative, for Summary Judgment filed by Defendant United States of America (the

"Government") (collectively with the Individual Defendants, the "Defendants"), (Filing No. 22) .

Also pending is a Motion for Partial Summary Judgment filed by Plaintiff Amy Harnishfeger

("Harnishfeger") (Filing No. 27).  On November 6, 2016, Harnishfeger filed a Complaint for

Declaratory and Injunctive Relief and Damages.  She alleges violation of her First Amendment

rights after she was terminated as a result of her publication of a book describing disturbing

conversations that she had with men while she was employed a phone-sex operator.  In their

Motions, the Defendants assert that they cannot be liable for violating Harnishfeger's First Amendment rights because Harnishfeger did not speak on a matter of public concern and because her interests in speaking as a public employee did not outweigh the Defendants' interests in promoting the efficient provision of government services (Filing No. 21 at 17-21; Filing No. 23 at 23-36; Filing No. 32 at 31-50). Additionally, the Defendants assert that even if Harnishfeger could demonstrate that they violated her First Amendment rights, she had no cause of action through which she could hold any of the Individual Defendants or the Government liable (Filing No. 21 at 7-26; Filing No. 23 at 12-17). In contrast, Harnishfeger contends that she is entitled to summary judgment—on all issues other than damages—because her speech was not related to her public role, was on a matter of public concern, and did not negatively affect the efficiency of governmental operations enough to justify suppression (Filing No. 28 at 24-60). For the following reasons, the Court **GRANTS** the Individual Defendants' Motion to Dismiss and the Government's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, and **DENIES** Harnishfeger's Motion for Partial Summary Judgment.

## I.  BACKGROUND

### A.  The Parties

The United States of America is named as a defendant pursuant to the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.* (the "APA"). The APA is the federal statute that governs the way in which administrative agencies of the federal government of the United States may propose and establish regulations. Lopez is the Indiana State Director for the AmeriCorps VISTA Program. Kubiszewski is a duly appointed Indiana State Program Officer for the AmeriCorps VISTA Program. Kopczynski is the duly appointed State Family Programs Director for the

Indiana National Guard.  Noelle Butler is a duly appointed Family Advocacy Specialist for the Indiana National Guard.

B.      **Factual Background**

In June 2016, Harnishfeger was selected by the federal Corporation for National and Community Service ("CNCS") to participate as a volunteer in the AmeriCorps Volunteers in Service to America Program ("VISTA") (Filing No. 27-1 at 3).  VISTA is a national service program designed to fight poverty in the United States (Filing No. 27-1 at 3).  Under the program, persons apply to participate directly with CNCS and, if selected by CNCS as a VISTA volunteer, the person applies separately to work at public or nonprofit organizations located in communities across America.  (Filing No. 27-1 at 3.)  As benefits for their work, VISTA volunteers receive a living allowance, professional development training, federal non-competitive eligibility status for federal employment, and an additional educational stipend or cash bonus upon the conclusion of their service.[1]

On June 24, 2016, Harnishfeger was placed with the Indiana National Guard (the "National Guard") through VISTA to work as part of the National Guard's State Family Programs office (Filing No. 27-1 at 3-4, 6).  The National Guard's State Family Programs (the "Family Programs") provides a variety of services to members of the National Guard and their families, including financial services, deployment readiness programs, youth programs, and aid to sexual and domestic violence victims.  *Family Resources*, INDIANA NATIONAL GUARD (March 21, 2018 9:33 AM), https://in.ng.mil/FamilyResources.aspx.  Although it required her to move from Tennessee to Indianapolis, Indiana, Harnishfeger sought placement with the National Guard because she had

---

[1]    *See also*, *About Americorps VISTA*, CORPORATION FOR NATIONAL & COMMUNITY SERVICE, https://www.nationalservice.gov/programs/americorps/americorpsvista/about-americorp -vista (last visited March 27, 2018).

always wanted to work with veterans and their families (Filing No. 27-1 at 3-4). Harnishfeger's responsibilities largely consisted of data entry tasks, including populating a database of local food banks, shelters, and other non-profit organizations that could be resources for veterans and their families through the Family Program website (Filing No. 27-1 at 4). While most of the information she needed was already available to her, Harnishfeger occasionally had to contact organizations directly to acquire the necessary information for the Family Program's database (Filing No. 27-1 at 4). Harnishfeger generally contacted such organizations over the telephone, but in instances where no contact information was available, she reached out to these organizations using her personal Facebook account (Filing No. 27-1 at 4-5; Filing No. 23-4). Specifically, Harnishfeger would use her personal Facebook account, which listed her employment status as "Military and Veteran Resource Outreach at Indiana National Guard," to comment or post directly onto the organizations' Facebook pages (Filing No. 21-3; Filing No. 27-1 at 5).

Prior to beginning her work as a VISTA volunteer, Harnishfeger worked as a phone sex operator for several different companies (Filing No. 27-1 at 1). In May 2016, one month before being placed with the National Guard, Harnishfeger self-published a short book entitled "Conversations with Monsters: 5 chilling, depraved and deviant phone sex conversations" ("Conversations with Monsters") under the pseudonym "A.M. Raddatz" (Filing No. 21-2). Conversations with Monsters provides recitations of five phone sex conversations, each of which describes fantasies involving sexual abuse, sexual assault, or violence directed towards children (Filing No. 21-2; Filing No. 27-1 at 1-2). Harnishfeger concedes that the conversations themselves are vile, disturbing and uncomfortable to read: each concerns pedophilic fantasies, several incestual, and two describe public masturbation. *Id*. She also incorporates some commentary into the conversations to provide context and to describe her feelings about the conversations (Filing

No. 21-2).  The conversations are titled: (1) Weekend Daddy and his "date" to McDonalds; (2) Drugging, raping and killing his 9 year old; (3) Jacking off under cape getting haircut; (4) Middle School DJ-pop, drop and lock it; and (5) Female caller-raping her daughter to have a baby. (Filing No. 23-2 at 4.)

In addition to the conversations themselves, Harnishfeger included an introduction and a conclusion in Conversations with Monsters to describe her thoughts and motivations for writing the book.  In her introduction, Harnishfeger stated that she does not know "what quite possessed [her] to write" Conversations with Monsters (Filing No. 21-2 at 6).  She proposed that perhaps she was motivated to write the book as "a purge of sorts or maybe … just to let others know about the monsters that may reside next door or ones that you may even live with" (Filing No. 21-2 at 6).  She also wrote that Conversations with Monsters may be meant "to rip the rose colored glasses off of the phone sex industry" and to encourage people to watch men around them more carefully (Filing No. 21-2 at 7).  Furthermore, Harnishfeger postulated, "Did I write this to scare you? Perhaps, but I more than likely I [sic] wrote it because it scares me" (Filing No. 21-2 at 7).  In her conclusion, Harnishfeger contemplated whether phone sex operators, like herself, in some way encourage individuals with such fantasies to carry them out or whether they instead fill a need for such individuals and prevent them from acting on their thoughts (Filing No. 21-2 at 34-35).

On June 2, 2016, Harnishfeger wrote a post on her personal Facebook page stating that she had finished and published Conversations with Monsters and that people could purchase her book through a link she provided to Amazon.com (Filing No. 21-3; Filing No. 27-1 at 2).  At all relevant times, Harnishfeger's personal Facebook account was set to private and only allowed members of the general public to view limited information about her (Filing No. 27-1 at 2, 5).  Under this privacy setting, only Harnishfeger's Facebook friends could view her individual posts, and anyone

wishing to see her individual posts would have to submit a request and be accepted as one of Harnishfeger's Facebook friends (Filing No. 27-1 at 2).

In September 2016, Harnishfeger's direct supervisor with the National Guard, Noelle Butler ("Butler"), requested to be Harnishfeger's Facebook friend (Filing No. 1 at 5; Filing No. 27-1 at 6). Based on their working relationship, Harnishfeger felt compelled to, and did, accept Butler's friend request (Filing No. 27-1 at 6). After becoming one of Harnishfeger's Facebook friends, Butler discovered Harnishfeger's June 2, 2016 Facebook post advertising Conversations with Monsters and informed Kopczynski, the State Family Programs Director for the National Guard, about the book (Filing No. 1 at 5; Filing No. 27-1 at 6).

On September 29, 2016, Kopczynski set up a meeting with Harnishfeger and Butler to discuss Conversations with Monsters (Filing No. 27-1 at 6). During that meeting, Kopczynski told Harnishfeger that Conversations with Monsters reflected poorly on the National Guard and the Family Program, which often worked with victims of domestic violence and abuse, and that she was being removed from her placement with the National Guard (Filing No. 27-1 at 6). Kopczynski formally requested Harnishfeger's removal on September 28, 2016, stating that Harnishfeger's Conversations with Monsters contained graphic content "in direct contrast with the Indiana National Guard's Domestic Violence Prevention and Response Plan" and that Harnishfeger's "public displays on social media do not reflect a positive image" of the National Guard (Filing No. 23-5 at 2-3).

On September 29, 2016, Harnishfeger received a letter from Lopez via email, the CNCS Indiana State Program Director, informing her she had been removed from the National Guard effective as of that day (Filing No. 27-1 at 7, 34). The letter stated that when a sponsoring organization [the National Guard] requests the removal of a VISTA member from a project, CNCS

complies.  (*See* Filing No. 1-2 at 1.)  Lopez's letter further notified Harnishfeger that she would be placed in Administrative Hold status for no longer than thirty days and that she would continue to receive her regular living allowance while in Administrative Hold status (Filing No. 27-1 at 34).

On October 6, 2016, Kubiszewski, a CNCS State Program Officer, sent a letter to Harnishfeger, indicating that CNCS was required to honor the National Guard's removal request.[2] Harnishfeger was informed that she had until October 25, 2016 to secure another VISTA assignment (Filing No. 27-1 at 35).  Kubiszewski also included a list of twenty-three other VISTA sponsored organizations in Indiana with which Harnishfeger could seek reassignment (Filing No. 27-1 at 35-37).  Several of the sponsoring organizations were located in Indianapolis.  *Id.* at 37. Kubiszewski warned Harnishfeger that if she could not secure a suitable assignment by October 25, 2016, she would be terminated from VISTA for lack of suitable assignment (Filing No. 27-1 at 36).

Harnishfeger found most of the organizations from the list provided by Kubiszewski unappealing because they did not involve work with veterans, nonetheless, she contacted five of the listed organizations (Filing No. 27-1 at 8-9).  Of those five organizations, she received a response from only one organization located in Bloomington, Indiana (Filing No. 27-1 at 9). However, Harnishfeger determined that this organization did not provide a "realistic alternative" for her because she could not afford to commute from Indianapolis to Bloomington for that position (Filing No. 27-1 at 9).  Because Harnishfeger did not secure a new placement within the

---

[2] Federal regulations specifically address this concern by requiring CNCS to honor all removal requests.; 45 C.F.R. § 2556.410 (2016) (stating that upon a sponsoring organization's removal request, "the State Program Director *shall* remove the VISTA from the project" unless, at the State Program Director's "*discretion*," the director seeks *and* is able to reach an alternative solution with the sponsoring organization within a "reasonable time period").

thirty days she was allotted, VISTA terminated her volunteer status on October 25, 2016 ([Filing No. 27-1 at 38](#)).

Harnishfeger initiated this lawsuit on November 6, 2016, alleging that the Defendants violated her First Amendment rights by removing her from the National Guard and subsequently terminating her from VISTA ([Filing No. 1](#)). Harnishfeger further alleged that, to the extent her termination from VISTA constitutes a "final agency action," the termination was "arbitrary, capricious, and [an] abuse of discretion" and contrary to law ([Filing No. 1](#)).

The Individual Defendants and the Government each respectively filed their Motions on April 12, 2017 ([Filing No. 20](#); [Filing No. 22](#)). The Individual Defendants contend that Harnishfeger cannot sustain claims against them for violating her First Amendment rights because no such cause of action against the Individual Defendants is available under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and because Harnishfeger has failed to allege sufficient facts to support such claims against Lopez and Kubiszewski ([Filing No. 21 at 5-12](#), 23-26). The Individual Defendants further argue that even if a cause of action existed to support a claim against them under the First Amendment, they are entitled to qualified immunity for Harnishfeger's claims because her speech in Conversations with Monsters was not on a matter of public concern and because Harnishfeger's interests in her speech did not clearly outweigh the governmental interests in efficiently providing public services ([Filing No. 21 at 12-23](#)).

The Government similarly asserts that Harnishfeger's First Amendment rights were not violated as a result of her removal from the National Guard and termination from VISTA because Conversations with Monsters does not address a matter of public concern and because the Government's interests in maintaining the effective functioning of governmental enterprises

outweighed Harnishfeger's free speech interests (Filing No. 23 at 15-34). Additionally, the Government asserts that Harnishfeger's allegations cannot support a claim that her termination from VISTA represented a "final agency decision" that was arbitrary, capricious, an abuse of discretion, or contrary to law, in violation of the APA, 5 U.S.C. § 551 *et seq*., because Harnishfeger's termination from VISTA was based on a lack of suitable assignment, rather than retaliation for writing Conversations with Monsters (Filing No. 23 at 10-15).

On May 5, 2017, Harnishfeger responded to the Defendants' Motions and filed her cross Motion for Partial Summary Judgment and Response in Opposition to Defendants' Motions to Dismiss or for Summary Judgment (Filing No. 27; Filing No. 28). In her Motion for Partial Summary Judgment, Harnishfeger notes that her motion seeks summary judgment pertaining to all substantive legal matters and leaves only the question of damages for trial (Filing No. 27). Specifically, Harnishfeger argues that she has asserted sufficient facts to state a cause of action against Kopczynski as a state actor, pursuant to 42 U.S.C. § 1983, and *Bivens* causes of action against Kubiszewski and Lopez as federal actors (Filing No. 28 at 21-33). She also contends that her speech in Conversations with Monsters was entirely unrelated to her work with the National Guard and addresses a matter of public concern (Filing No. 28 at 33-44). Harnishfeger further claims that her free speech interests greatly outweigh any governmental interests that may exist in promoting the efficient provision of public services (Filing No. 28 at 44-60). Moreover, Harnishfeger asserts that the Individual Defendants cannot avoid liability for violating her First Amendment rights through qualified immunity because it was clearly established that Conversations with Monsters pertained to a matter of public concern and that her free speech interests would outweigh any governmental interests (Filing No. 28 at 60-68).

## II.  <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 12(d), if a motion filed pursuant to Rule 12(b)(6) or 12(c) presents "matters outside the pleadings" that are "not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  However, a court may not convert a motion to dismiss into a motion for summary judgment unless "[a]ll parties [are] given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  "Adequate notice is provided when the moving party frames its motion in the alternative as one for summary judgment."  *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1029 (7th Cir. 2006).  In this instance, the Government alternatively framed its Motion to Dismiss as a motion for summary judgment, and the Individual Defendants combined their response to Harnishfeger's Motion for Partial Summary Judgment with its Reply in Support of their Motion to Dismiss, including evidence outside of the pleadings (Filing No. 22; Filing No. 32).  As such, the Court **CONVERTS** the Defendants' respective Motions into Motions for Summary Judgment.

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the Court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor."  *Zerante*, 555 F.3d at 584 (citation omitted).

"However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III. DISCUSSION

### A. First Amendment Allegations[3]

When a citizen is employed by a government entity, "the citizen by necessity must accept certain limitations on his or her freedom. Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be

---

[3] Even though Harnishfeger was considered a VISTA participant, she does not refute that her speech must be analyzed under the public-employee speech framework. Therefore, the Court will analyze Harnishfeger's speech within the context of the public-employee speech framework, and any arguments Harnishfeger may assert to the contrary are waived. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir.2012) (undeveloped arguments and arguments unsupported by pertinent authority are waived).

little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (internal citations omitted). Although "[a] government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment," "a governmental employer may impose certain restraints on the speech of its employees … that would be unconstitutional if applied to the general public." *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 80 (2004).

In order for a public employee's speech to be protected under the First Amendment, the employee must demonstrate "that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 792 (7th Cir. 2016) (internal quotations omitted). While government employers may suppress their public employees' speech made within their official capacities, *Garcetti*, 547 U.S. at 418-19, one must ask whether a public employee's speech "is itself ordinary within the scope of an employee's duties." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014). "To determine the scope of a public employee's official duties, we look not only to the applicable job description but also to unwritten responsibilities that the employee is expected to perform." *Kristofek*, 832 F.3d at 793.

In this instance, where Harnishfeger wrote Conversations with Monsters prior to working with VISTA or the National Guard, her speech undoubtedly was made as a private citizen outside of her official duties with the National Guard. However, in order for her speech to be protected, Harnishfeger must still prove that Conversations with Monsters addresses a matter of public concern and that her free speech interests in writing and publishing Conversations with Monsters

outweigh any governmental interests in the efficient and effective administration of public services.  *See Kristofek*, 832 F.3d at 792.  The Court addresses each of these elements in turn.

### 1.  <u>Matters of Public Concern</u>

As a threshold matter, the Court must determine whether Harnishfeger's speech in Conversations with Monsters addresses a matter of public concern.  *See Rankin v. McPherson*, 483 U.S. 378, 384 (1987) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)); *see also*, *Roe*, 543 U.S. at 82-83; *Garcetti*, 547 U.S. at 418.  "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.  If the answer is yes, then the possibility of a First Amendment claim arises."  *Garcetti*, 547 U.S. at 418.  Speech addresses a matter of public concern if "it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  *Snyder v. Phelps*, 562 U.S. 443, 453 (2011); *see also*, *Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 684 (7th Cir. 2014).  To determine whether speech relates to a matter of public concern, a court must consider the "content, form, and context" of the speech based on the record as a whole, with content being the most important of these factors.  *Kristofek*, 832 F.3d at 794 (internal quotations omitted) (citing *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 377 (7th Cir. 2009)); *see also*, *Craig v. Rich Twp. High Sch. Dist. 227*, 763 F.3d 1110, 1115-16 (7th Cir. 2013).  A court must "look at the overall *objective* or *point* of [an employee's speech] to determine whether it discussed matters of public concern."  *Meade*, 770 F.3d at 684 (emphasis in original) (internal quotations omitted).  The motivation for a public employee's speech "may shed light on ambiguous statements" but is not dispositive as to whether that speech relates to a matter of public concern.

*Id*. at 685. "Whether an employee's speech implicates a matter of public concern is a question of law." *Craig*, 763 F.3d at 1115-16.

In her Motion for Partial Summary Judgment, Harnishfeger asserts that Conversations with Monsters addresses matters of public concern by (1) expressing her opinions on issues of public safety and safety from sexual predators, (2) providing advice to individuals considering employment as phone sex operators, and (3) serving as a source of entertainment ([Filing No. 28 at 38-44](#)). The Court disagrees.

The vast majority of Conversations with Monsters simply recites (in graphic, explicit and profane language) phone sex conversations in which Harnishfeger participated involving fantasies of sexual assault, incest, pedophilia, sexual abuse, and violence directed toward children ([Filing No. 21-2](#)). The publication is exactly what she titles it to be: "5 chilling, depraved and deviant phone sex conversations." ([Filing No. 23-2 at 2](#).) Courts have previously held that descriptions of sexual exploits alone do not constitute matters of public concern. *See Craig*, 736 F.3d at 1117 (finding that "[t]he district court correctly observed that some parts [of a book written by a school guidance counselor], such as [the guidance counselor's] description of his own sexual exploits, would not relate to a matter of public interest if viewed in isolation"); *see also*, *Dible v. City of Chandler*, 515 F.3d 918, 927 (9th Cir. 2008) (determining that speech describing activities that "were simply vulgar and indecent … did not contribute speech on a matter of public concern").

Unlike the publication in *Craig*, Conversations with Monsters contains no "garden variety advice." The disclaimer for her publication reads as follows:

> These stories are from real phone sex calls. They are not made up for sensationalism nor to sell copies. They are the author's personal accounts during the 6 years being a phone sex operator for over 12 companies. Stories were documented by the author as they happened or shortly after. The emotions and revulsion are real. These stories are vile in nature and will give you nightmares. They are not sexy funny stories meant to titillate. These callers, whether true or not are the basis for all monsters.

> If you are easily offended, please do not purchase this book. If you want to know the truly debased sexual fantasies of men that call phone sex lines, continue reading.

([Filing No. 23-2 at 5](#)).   While Harnishfeger included an introduction, conclusion, and some commentary in Conversations with Monsters ([Filing No. 21-2](#)), none of this additional content expresses her opinions regarding sexual predators, provides advice, or otherwise addresses any subject of legitimate new interest in a meaningful way.   Harnishfeger's commentary merely provides context for the conversations and expresses her personal feelings about the conversations, neither of which rise to the level of legitimate newsworthiness.   Although Harnishfeger attempts to present her motivations for writing the book and thought-provoking questions about the functions such phone sex conversations may serve, this alone does not suggest that Conversations with Monsters as a whole addresses any topic of general interest or debate.   *Cf. Craig*, 736 F.3d at 1117-18 (holding that a school guidance counselor's book providing advice on relationship dynamics as a whole addresses a matter of public concern even though portions of the book describing his personal sexual exploitations did not pertain to matters of public concern). Therefore, the Court concludes that Conversations with Monsters as a whole fails to address a matter of public concern and is not protected as public-employee speech under the First Amendment.

### 2.   *Pickering* Balancing Test

Even if Harnishfeger's speech in Conversations with Monsters could be said to address a matter of public concern, Harnishfeger's First Amendment interests are outweighed by the Government's interests "as an employer, in promoting the efficiency of the public services it performs through its employees."   *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Determining "[t]he proper balance of these competing interests is a question of law."   *Craig*, 763

F.3d at 1118 (internal quotations omitted). In balancing a public employee's interest in free speech with a government employer's management interests, a court considers the following factors:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Kristofek*, 832 F.3d at 795-96 (quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000)); *see also*, *Graber v. Clarke*, 763 F.3d 888, 896 (7th Cir. 2014)(noting that a court need not address each of the seven factors individually).

In light of these factors, a court must focus "on the effective functioning of the public employer's enterprise" when evaluating state interests. *Rankin*, 483 U.S. at 388; *see also*, *Craig*, 763 F.3d at 1119. "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Rankin*, 483 U.S. at 388; *see also*, *Craig*, 763 F.3d at 1119. When considering the degree of disruption resulting from an employee's speech, a government employer is not required "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick v. Myers*, 461 U.S. 138, 152 (1983). Therefore, a government employer may consider both the actual and potential disruptions that the speech may cause based on the government employer's "reasonable predictions of disruption." *Craig*, 736 F.3d at 1119. For an employer's predictions of disruption to be "reasonable," its "predictions must be supported with an evidentiary foundation and be more than mere speculation." *Id*. (internal quotation marks omitted).

Whether the level of disruption or potential disruption justifies restricting an employee's speech depends on (1) the content of the speech; (2) the nature of the speech; and (3) the time, place, and manner of the speech. *See id.* With respect to the speech's content, a government employer may need to make a stronger showing of disruption "when an employee's speech more substantially involves matters of public concern.'" *Id.* (quoting *McGreal v. Ostrov*, 368 F.3d 657, 681 (7th Cir. 2004)). However, "'[t]he less serious, portentous, political, [or] significant the genre of expression, the less imposing the justification that the government must put forth in order to be permitted to suppress the expression.'" *Craig*, 736 F.3d at 1119 (quoting *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994)). Furthermore, if an employee's position requires contact with the public, a government "employer may have more leeway" to restrict that employee's speech. *Craig*, 763 F.3d at 1119 (citing *Rankin*, 483 U.S. at 390-91).

The Court concludes that the Defendants' interests in preventing potential disruption in the workplace and to the National Guard's mission as a result of Conversations with Monsters outweigh Harnishfeger's free speech interests in this instance. As discussed above, Conversations with Monsters does not address a matter of public concern; therefore, the Defendants need not provide a significantly strong showing of disruption in order to justify the restriction on Harnishfeger's speech. *See Craig*, 736 F.3d at 1119. Importantly, Harnishfeger's volunteer position within the National Guard was with Family Programs and included providing resources and services for youth programs and victims of domestic violence and sexual assault. The Defendants reasonably believed that the themes of domestic and sexual violence towards children in Conversations with Monsters would negatively affect the National Guard's ability to serve veterans and their families through its Family Programs, including programs designed to serve victims of domestic violence and sexual assault, if it became public knowledge. *See Craig*, 736

F.3d at 1120 (determining that a school district's interests in suppressing an advice book written by a school guidance counselor that included sexually explicit content and sexualized women outweighed the guidance counselor's free speech interests because the school district reasonably believed the book would make students more apprehensive to employ counseling services after learning about the book); *see also*, *Mills v. City of Evansville*, No. 3:03CV00183-JDT-WGH, 2005 WL 1939917, at *1, *7 (S.D. Ind. June 28, 2005) (finding that even though a police officer's speech did not directly impede her ability to perform her job, her superiors reasonably believed that her speech would negatively impact their ability to achieve their overall goals, which weighed in favor of the government on the third *Pickering* factor).

The Defendants also reasonably believed that Harnishfeger's authorship could become more publicized. The Court is not persuaded by Harnishfeger argument that the risk of her authorship of Conversations with Monsters becoming public knowledge is minimal because she used a pseudonym and set her Facebook account settings to private. The fact is that by friending Butler on Facebook, Harnishfeger had allowed the book to become public knowledge as Butler was free to spread knowledge of the publication which was being sold publically on Amazon.com. It is also reasonable for the Defendants to believe that Harnishfeger could accept Facebook friend requests from other individuals from the National Guard or individuals from the organizations she contacted on the National Guard's behalf based on the fact that she previously accepted Butler's friend request. Moreover, while Harnishfeger asserts that her role with the National Guard required only minimal contact with the public, she was obligated to contact the public on the National Guard's behalf on multiple occasions, entitling the Government to greater leeway in restricting Harnishfeger's speech. *See Craig*, 763 F.3d at 1119. Finally, even though Conversations with Monsters was written before Harnishfeger began working with the National

Guard, Harnishfeger sufficiently linked her work with the National Guard to Conversations with Monsters by communicating with organizations on the National Guard's behalf and holding herself out as an employee of the National Guard through the same Facebook page where she advertised her authorship of Conversations with Monsters and the sale of her book on Amazon.com. As such, the Defendants' interest in preventing disruption and promoting the efficient provision of public services outweighs Harnishfeger's interests in free speech. Therefore, none of the Defendants can be liable for violating Harnishfeger's First Amendment rights.

**B.**   ***Bivens* and Administrative Procedures Act Causes of Action**

Harnishfeger's action is brought against the state defendants pursuant to 42 U.S.C. § 1983 and against the federal defendants pursuant to both 5 U.S.C. § 701, *et seq.*, and *Bivens*. As the United States Supreme Court has noted, "*Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." *Carlson v. Green*, 446 U.S. 14, 18 (1980). Because the Court finds that none of the Defendants violated Harnishfeger's constitutional rights, she cannot sustain a cause of action against any of the Individual Defendants personally under *Bivens* or § 1983. *See Bivens*, 403 U.S. at 396-97; 42 U.S.C. § 1983. Therefore, the Court need not determine whether Harnishfeger could have maintained a *Bivens* causes of action against the Individual Defendants if she were able to prove the Individual Defendants violated her First Amendment rights.

Additionally, the Court concludes that the Government cannot be held liable to Harnishfeger for violating the APA. Under the APA, a governmental agency cannot act in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2).

When evaluating an agency action, a court "must assess, among other matters, whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. That task involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (internal quotations and citations omitted); *see also*, *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (determining that an agency must "examine the relevant data and articulate a satisfactory explanation for its action") (internal quotations omitted); *Zero Zone, Inc. v. U.S. Dept. of Energy*, 832 F.3d 654, 668 (7th Cir. 2016). Courts are required to give great deference to an agency's judgments in their areas of expertise and may not substitute its judgment for that of the agency. *Fox Television*, 556 U.S. at 514; *Zero Zone*, 832 F.3d at 668. A court must "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Fox Television*, 556 U.S. at 514 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 491 U.S. 281, 286 (1974)).

Although Harnishfeger alleged that her termination from VISTA was arbitrary, capricious, an abuse of discretion, or contrary to law to the extent it constitutes a final agency action, the Court disagrees. As discussed above, Harnishfeger's removal from the National Guard and termination from VISTA did not violate the First Amendment. The letters sent by Kubiszewski and Lopez state that CNCS terminated Harnishfeger from VISTA for a non-cause reason merely because she was unable to find a suitable assignment within thirty days after being removed from the National Guard (Filing No. 27-1 at 35-38). Furthermore, Harnishfeger failed to provide any evidence indicating that CNCS decided to terminate her from VISTA for any reason other than a lack of suitable assignment. Had Harnishfeger applied and been accepted for placement with one of the twenty-three non-profit organizations on the list provided by Kubiszewski, she would have been

able to complete a VISTA assignment. Because Harnishfeger's termination was not in retaliation for her speech in violation of the First Amendment, and because Harnishfeger failed to provide any evidence to the contrary, the Government has demonstrated that CNCS had sufficient justification to terminate Harnishfeger based on a lack of suitable assignment and that their termination decision was not arbitrary, capricious, or contrary to law. Therefore, Harnishfeger cannot sustain a claim against the Government pursuant to the APA.

## IV.  CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendants' Motions for Summary Judgment ([Filing No. 20](); [Filing No. 22]()) and **DENIES** Harnishfeger's Motion for Partial Summary Judgment ([Filing No. 27]()).  Judgment will be entered accordingly.

**SO ORDERED**.

Date:  3/29/2018

_Tanya Walton Pratt_
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov

Danielle Wolfson Young
DEPARTMENT OF JUSTICE
danielle.young2@usdoj.gov