# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMY HARNISHFEGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-03035-TWP-DLP |
| | ) | |
| COL. LISA KOPCZYNSKI in her official | ) | |
| capacity as Family Programs Director of the | ) | |
| Indiana National Guard and her individual | ) | |
| capacity, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on cross motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56 by Plaintiff Amy Harnishfeger ("Harnishfeger") ([Filing No. 97](#)) and Defendant Lieutenant Colonel Lisa Kopczynski ("Kopczynski") (in both her official capacity as Family Programs Director of the Indiana National Guard ("National Guard") and her personal capacity) ([Filing No. 99](#)).  Harnishfeger initiated this action alleging violations of her First Amendment rights and entitlement to special damages for lost wages following her removal from her National Guard placement for speech on a matter of public concern.  Kopczynski cross-motioned asserting that she is entitled to qualified immunity.  For the following reasons, the Court **grants in part and denies in part** Harnishfeger's Motion for Partial Summary Judgment and **denies** Kopczynski's Cross-Motion for Summary Judgment.

## I.     BACKGROUND

In May 2016, Harnishfeger pseudonymously self-published a book called "*Conversations with Monsters*" ("*Conversations*"), and made it available for online purchase and download on Amazon, an online marketplace ([Filing No. 97-1 at 2](#)).  The twenty-page work consisted of five

conversations Harnishfeger had with callers while she was previously employed as a phone-sex operator for different companies. *Id*. at 1–2; 13–35. On June 2, 2016, Harnishfeger announced the publication of her book on Facebook, a social networking site, through a "post" on her Facebook profile and included the link to the book's Amazon page. *Id*. at 2. Harnishfeger's Facebook profile was "set to private," which meant that only the persons who had been pre-approved as a "friend" by Harnishfeger could view her page and the substance of her posts. *Id*. at 2–3. Because Facebook posts are generally listed in chronological order with the most recent communications appearing first, Harnishfeger's frequent posting resulted in the June 2016 announcement being pushed further down in the lists of posts on her page. *Id*. at 3. This meant that "as little as a week or two" later, even Harnishfeger's approved Facebook friends would have had to search for the publication announcement if they had not seen it when it was originally posted. *Id*.

The eponymic conversations of the book were admittedly "vile, disturbing, and uncomfortable to read," as they dealt with "pedophilic fantasies," "incestual" subject matter, and descriptions of public masturbation. *Id.* at 2. Harnishfeger relayed these "debased fantasies" to share her experiences with these callers as well as to "ensure that persons are aware of the dangers of sexual predators." *Id*. Harnishfeger included "editorial commentary" throughout the conversations in her book and concluded with her "Final Thoughts," which opined that the callers and others like them were "sick and maladjusted" and needed to "end things once and for all." *Id*. at 2, 34. Prior to the initiation of these proceedings and the termination at issue, ten copies of *Conversations with Monsters* were sold. *Id*. at 3. Harnishfeger and three of her close friends and family were among those buyers. *Id*.

A month after Harnishfeger published *Conversations*, she was selected to participate in the AmeriCorps VISTA Program ("VISTA Program"). *Id*. As a national service program, the VISTA program is one of hundreds within the federal network of AmeriCorps and is "dedicated to the improvement of communities."[1] Participants in the VISTA Program serve full-time for one year at self-selected non-profit organizations or local government agencies which sponsors them if approved for placement. As VISTA "volunteers," applicants work without a salary but receive a "living allowance" as well as eligibility for medical and dental coverage, "vacation and sick time," and "additional funds for schooling, or a cash bonus" at the end of their term (*See generally* Filing No. 97-3). Prior to September 29, 2020, AmeriCorps was administered by the Corporation for National and Community Service ("CNCS") which now operates as AmeriCorps.[2] Following her acceptance into the VISTA Program, Harnishfeger applied and "obtained placement at the Indiana National Guard" in the Family Program Office (Filing No. 97-1 at 4).

Harnishfeger began her term as a VISTA volunteer with the National Guard Family Program Office on June 24, 2016. *Id*. Leaving Tennessee to travel to Indianapolis, Indiana for this position, Harnishfeger was contracted for the full twelve-month term, which was set to end on or around late June 2017. Harnishfeger was hired by Kopczynski who served as the Family Program Director. Her direct supervisor was the Family Assistance Coordinator, Noelle Butler ("Butler"). *Id*. Harnishfeger's responsibilities consisted of data collection and entry about different service organizations aiding veterans and their families, and "placing that information into a database for further dissemination" through the National Guard's website. *Id*. at 4–5.

---

[1] *See* AmeriCorps FAQs https://www.americorps.gov/about/faqs (last visited Jan. 3, 2022).

[2] *See* AmeriCorps FAQs, https://www.americorps.gov/about/faqs (last visited Jan. 3, 2022).

A considerable amount of the information that Harnishfeger was tasked with entering into the National Guard database had already been collected by the VISTA volunteer that came before her.  Typically, Harnishfeger would be responsible for "cleaning up" that information and putting it "in the proper format."  *Id*. at 5.  If she could not find sufficient information for an organization to be entered into the database, Harnishfeger would be required to contact that organization directly. This was done occasionally—"perhaps a dozen times" in three months—with most of the communications happening over the telephone and possibly once or twice over e-mail. *Id*. at 5-6.

On two occasions, Harnishfeger could not ascertain the contact information for an organization and communicated with them through her personal Facebook account.  She did this by leaving a Facebook "comment" on the organizations' Facebook pages.  Harnishfeger did not have to request or accept the service providers as Facebook "friends" to post her comment. Because her personal Facebook profile was set to private, these service organizations, as well as other Facebook users who were not on her accepted friends' list, would only be able to view limited content on her page and would not be able to view any information related to *Conversations*.  *Id*. Harnishfeger's Facebook page identified her as working at the National Guard.  *Id*.

These instances of contact with the service organizations were the only times that Harnishfeger had any direct contact with the public on behalf of the National Guard.  *Id*. at 6–7. Her core responsibilities remained unchanged throughout her term as a VISTA volunteer. Harnishfeger performed her duties adequately and did not receive any "criticism or negative feedback" for the performance of her job duties.  *Id.* at 7.

Not long after Harnishfeger began her term as a VISTA volunteer, she received a request on Facebook to become Facebook "friends" with her direct supervisor, Butler.  Harnishfeger felt compelled to accept the request to become friends with Butler because of their working

relationship.  Harnishfeger did not usually become Facebook friends with work colleagues and took deliberate efforts to ensure that work colleagues could not view her private page.  In accepting Butler's "friend request," Harnishfeger gave her access to her private Facebook profile and its contents . *Id.* at 7–8.

A few days later,  Butler came across the June 2016 post about *Conversations*.  Because of the chronological nature of Facebook posts and Harnishfeger's habit of making posts "quite frequently," Butler would have had to have scrolled through "many dozens, if not hundreds" of posts to find the one announcing the publication of *Conversations*.  *Id*. at 9.  During her lunch hour at work one day, Butler and another National Guard employee purchased Harnishfeger's book and began reading it ([Filing No. 97-2 at 40](#)).  On September 27, 2016, Butler and the other National Guard employee went to Kopczynski to inform her of what they had discovered.  *Id*. at 39.  Later that afternoon, the pair sent Kopczynski screenshots of Harnishfeger's June 2016 Facebook post announcing *Conversations* along with an e-mail containing a link to the book on the Amazon platform.  *Id.*

Kopczynski did not read the book in its entirety and instead "skimmed it to get the gist." *Id.* at 40.  Kopczynski's initial reaction to the book was one of disgust.  *Id*. at 41.  That same day, Kopczynski contacted her direct supervisors, the attorney for the National Guard, and the VISTA Program liaison to the National Guard Emily Kubiszewski ("Kubiszewski") to review her options concerning Harnishfeger.  *Id.* at 47–49.  On September 28, 2016, the day after she learned of the book, Kopczynski called Harnishfeger into a meeting that included Butler.  *Id.* at 43.  At this point, Kopczynski had already decided that Harnishfeger could not continue to work for the National Guard.  *Id* at 44.  Kopczynski informed Harnishfeger that *Conversations* was "really horrible," and

she could "not have anyone find out about this," and that the book did not present the National Guard "in a favorable light." (Filing No. 97-1 at 8.)

Harnishfeger was told that because of the book, she would be removed from her placement with the National Guard. *Id.* She was offered two options, either she could resign from the VISTA Program or Kopczynski could submit a formal request for removal from the National Guard (Filing No. 97-2 at 51). Harnishfeger opted to not resign and was asked to turn in her access card and leave the building (Filing No. 97-1 at 8). The next day, Harnishfeger received an e-mailed letter from the Indiana State Program Director of the VISTA Program Louis Lopez ("Lopez") informing her that she was being placed on "Administrative Hold status" for a thirty-day period. *Id.*

At the beginning of October 2016, Kubiszewski called Harnishfeger and informed her that her placement with the National Guard was over but, if she "took specifics steps with respect to her personal Facebook page," she could apply to another assignment through the VISTA Program. *Id.* at 9. As a result, Harnishfeger deleted her Facebook page. *Id.* Harnishfeger received a letter from Kubiszewski dated October 6, 2016 stating that she was removed from her National Guard placement and would have to secure an assignment with another organization by October 25, 2016, to remain in the VISTA Program. *Id.* at 37. Kubiszewski also provided Harnishfeger with a list of Indiana public and nonprofit organizations enrolled in the VISTA Program. *Id.* at 39.

None of the listed organizations appealed to Harnishfeger given that she moved to Indiana "specifically to work with an organization that served veterans," and none of these organizations "provided that opportunity." *Id.* at 10. There were also logistical challenges for Harnishfeger because many of the organizations were not located in Indianapolis, where she signed a twelve-month lease, and she could not afford to commute. *Id.* Harnishfeger ultimately contacted five of the listed organizations but was unsuccessful in securing a new placement. *Id.* at 11. Upon advice

of her attorney, she made an effort to try to get a job with VISTA to prove that the program did not want her, and because "I have a duty to try to mitigate my circumstances." (Filing No. 99-10). She did not secure an assignment by the deadline, and in a letter dated October 25, 2016, Lopez— the State Program Director for Indiana—informed Harnishfeger that her VISTA service was terminated "for lack of suitable assignment." *Id.* at 40.

Following her termination from the VISTA Program, Harnishfeger rapidly secured new employment as a social worker in New Castle, Indiana, where she began working on December 5, 2016. She was out of work for forty days and, during this period, lost $1,152.91 in compensation. In addition to these lost wages, Harnishfeger suffered emotional harm. *Id.* at 11. She initiated this action on November 6, 2016, by filing a Complaint for Declaratory and Injunctive Relief and Damages (Filing No. 1). Harnishfeger sued Lopez, Kubiszewski, Kopczynski, and Butler in their personal and official capacities, as well as the United States government, for violating her rights under the First and Fourteenth Amendments and the Administrative Procedure Act. *See* 5 U.S.C. § 706. The defendants in their personal capacities (excluding Butler because she was subsequently dismissed on a motion by Harnishfeger) sought dismissal of the Complaint (*see* Filing No. 20), and the United States moved for dismissal, or in the alternative for summary judgment, for the defendants in their official capacities (Filing No. 22). The defendants' motions were converted to motions for summary judgment and the Court granted the defendants' motions and entered final judgment in their favor (Filing No. 44).

Harnishfeger appealed the final judgment, and the Seventh Circuit affirmed the judgment as to the United States, Lopez, Butler, and Kubiszewski and reversed and remanded the First Amendment claim against Kopczynski. *See Harnishfeger v. United States*, 943 F.3d 1105 (7th Cir. 2019). Harnishfeger now moves for partial summary judgment against Kopczynski in her

7

official and individual capacities for violation of her First Amendment rights, her lost wages, and denial of a qualified immunity defense (Filing No. 97).  Kopczynski cross-moves for summary judgment on qualified immunity (Filing No. 99).

## II.   LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."  *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."  *Hemsworth*, 476 F.3d at 490 (citation omitted).  "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits

of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

## III.   DISCUSSION

In her Complaint, Harnishfeger alleges that Kopczynski violated her rights under the First Amendment (Filing No. 1 at 9). Following the Seventh Circuit's decision on appeal, Harnishfeger asserts the issues remaining for this Court's resolution are (a) whether her First Amendment rights were violated, (b) whether Kopczynski is nonetheless entitled to qualified immunity, and (c) the amount of Harnishfeger's damages. (Filing No. 98 at 16.) Harnishfeger argues that she is entitled to summary judgment because neither her authorship nor publication of *Conversations* caused any workplace disruption, and no disruption was likely to occur in the future. *Id.* at 17. Harnishfeger also maintains that she is entitled to summary judgment on an award of her lost wages. *Id.*

9

Kopczynski cross-moves for summary judgment asserting that the Seventh Circuit did not fully resolve whether she violated Harnishfeger's First Amendment rights.  (Filing No. 100 at 10.) Kopczynski contends that a fully developed record supports the Government's interest in removing Harnishfeger from her VISTA service because of her speech.  *Id*. at 11.  Similarly, Kopczynski argues the "further developed record" supports a finding that she is entitled to qualified immunity. *Id*.

The parties agrees that the issues for this Court to decide are whether Kopczynski violated Harnishfeger's First Amendment rights, whether Kopczynski is nonetheless entitled to qualified immunity, and any potential appropriate award of compensatory damages for Harnishfeger.

**A.** **First Amendment Claim**

On Harnishfeger's First Amendment claim against Kopczynski, the Court proceeds directly in its public-employee speech doctrine examination to find the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563 (1968).  Deciding "the proper balance of these competing interests is a question of law." *Chaklos v. Stevens*, 560 F.3d 705, 715 (7th Cir. 2009).  Generally, a determination of whether the speech in question involves matters of public concern is undertaken before proceeding to the balancing required under *Pickering*.  *See Rankin v. McPherson*, 483 U.S. 378, 384, (1987) ("The threshold question in applying this balancing test is whether [an employee's] speech may be 'fairly characterized as constituting speech on a matter of public concern.'") (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). In this case, that initial inquiry is not required.

The Court of Appeals' decision in *Harnishfeger*, has significantly narrowed the scope of the First Amendment claim against Kopczynski was and this Court accepts the findings of the Seventh Circuit. *See Dobbs v. DePuy Orthopaedics, Inc.*, 885 F.3d 455, 458 (7th Cir. 2018) ("'[O]nce an appellate court either expressly or by necessary implication decides an issue, the decision [is] binding upon all subsequent proceedings in the same case' under the law-of-the-case doctrine.") (quoting *Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991)). The Seventh Circuit unequivocally held that "*Conversations* was speech on a matter of public concern within the meaning of *NTEU*,"—that is, *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995)—and "Harnishfeger is therefore entitled to *Pickering* balancing." *Harnishfeger*, 943 F.3d at 1115. This is undisputed by the parties (*see* Filing No. 98 at 17; Filing No. 100 at 10). Thus, the core of the issue at present, with the benefit of a further developed record, is determining whether the *Pickering* balancing weighs in favor of Harnishfeger or Kopczynski.

1.  **Factors in Balancing an Employee's Free-Speech Interests Against an Employer's Management Interests**

In balancing a public employee's free speech interest with a government employer's efficiency and management interests, a court considers the following factors:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 795-96 (7th Cir. 2016) (quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000)). These factors serve as guideposts in determining the level of constitutional protection afforded to Harnishfeger's speech. In order for her speech to be constitutionally protected, Harnishfeger must show that her interest "as a citizen, in commenting

11

upon matters of public concern," outweighs the National Guard's interest "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

As noted by the Seventh Circuit,

> When a public employer moves for summary judgment on the *Pickering* balancing defense, therefore, it must "lay out the elements of the [defense], cite the facts which it believes satisf[y] these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant" on the defense. *See Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (summary judgment standard where movant bears burden of proof on claim or defense).

*Harnishfeger*, 943 F.3d at 1116.  Kopczynski contends that "nearly all of the factors [a court may consider in applying *Pickering* balancing] support [her] decision" to remove Harnishfeger from her placement at the National Guard (Filing No. 100 at 13).  It is generally unnecessary to consider every factor in the seven-factor inquiry for *Pickering* balancing. *See Graber v. Clarke*, 763 F.3d 888, 896 (7th Cir. 2014) (finding that a court need not address each of the seven factors individually).  However, the parties have collectively acknowledged each factor so the Court will address each in turn.

### a.   Whether *Conversations* would create problems in maintaining discipline or harmony among co-workers

Harnishfeger argues that Kopczynski's interest in suppressing her speech was "virtually non-existent."  (Filing No. 98 at 19.)  In addressing whether the speech would create problems in maintaining discipline or harmony among co-workers, Harnishfeger asserts that the only disruption articulated by Kopczynski was "the fact that a handful of employees discussed [her] book over their lunch hour." *Id.* Harnishfeger argues this was akin to "workplace gossip," and nowhere on the level of disruption "that threatens the effective and efficient fulfillment of [the government's] responsibilities to the public." *Id.* (internal quotation marks and citation omitted).

Harnishfeger asserts that Kopczynski's claims of disruption do not benefit from the record developed at summary judgment and were previously rejected by the Seventh Circuit on appeal. *Id.* at 20.

Harnishfeger identifies two concerns expressed by Kopczynski about how *Conversations* could have potentially affected the National Guard: (1) the speech did not create a culture that reduces violent behavior; and (2) the speech did not reflect a positive image of the National Guard. *Id.* at 19. Harnishfeger asserts that the Seventh Circuit has already addressed and rejected the first concern, finding: "*Conversations* neither promotes violence nor discourages victims of violence from seeking help." 943 F.3d 1105 at 1118. Regarding the alleged negative image *Conversations* supposedly reflected on the National Guard, Harnishfeger asserts that the Seventh Circuit's conclusion similarly rejects this contention because "'there is no . . . reasonable inference' that '*Conversations with Monsters*' would or could 'reflect[] poorly on the [National Guard]'—'certainly not to an extent that would risk compromising the [National Guard's] mission.'" ([Filing No. 98 at 20](#)) (quoting 943 F.3d 1105 at 1117.) Harnishfeger asserts that the routine and clerical nature of her work and her efforts to not be linked to the book are part of the reasons why Kopczynski's concerns were without merit. *Id.*

Kopczynski asserts that Harnishfeger's speech was disruptive to "the workplace and the mission of the Family Program Office." ([Filing No. 100 at 13](#).) The statements in *Conversations*, "taken on their face," demonstrate that Harnishfeger "encouraged or least [sic] condoned extreme violence and sexual abuse against children." *Id.* Kopczynski argues that Harnishfeger's speech "can be read to encourage or condone men who are planning or at least fantasizing about raping and harming their own children and others," and directly contradicts the Family Program Office mission. *Id.* at 14. Kopczynski asserts that by sharing the publication of the book on her Facebook

page, "which she knew her supervisor had access to," Harnishfeger "demonstrated, at best, a lack of judgment and, at worst, a disregard for the people she was helping." *Id.*

Kopczynski argues that Harnishfeger's decision to identify herself on her Facebook page as a National Guard employee, communicate with community partners via the Facebook page, and "in turn provide[] a link to the book on that same page," was a strong consideration in the decision to remove her as it exhibited a lack of judgment. *Id.* Kopczynski maintains she had "legitimate concerns" the book would be discovered and undermine the mission of the Family Program Office and its relationship with its partners. *Id.* And Harnishfeger's speech impacted workplace harmony in that her statements in *Conversations* "undermined her credibility and created disharmony with her supervisors and co-workers." *Id.* She argues that the National Guard has a strong interest in "camaraderie and internal harmony." *Id.* Kopczynski contends that she reasonably believed that keeping Harnishfeger in her VISTA post would frustrate the mission of the small office and was concerned *Conversations* would "continue to disrupt workplace harmony" because of the "distrust surrounding her." *Id.*

In evaluating the level of disruption resulting from an employee's speech, a government employer is not required "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152. Thus, a government employer may contemplate both the actual and potential disruptions that the speech may cause based on the government employer's "reasonable predictions of disruption." *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1119 (7th Cir. 2013). Kopczynski's assertion that *Conversations* was disruptive to the mission and workplace of the National Guard is unsupported by the evidence in record. *See Chaklos*, 560 F.3d at 715 (finding

14

that for an employer's predictions of disruption to be "reasonable," its "predictions must be supported with an evidentiary foundation and be more than mere speculation.").

The Court disagrees with Kopczynski that *Conversations* can be read as condoning or encouraging violence and sexual predation against children. As the introduction, editorial commentary, and "Final Thoughts" portions of the book make clear, the callers and others like them were "vile," and "sick and maladjusted," according to Harnishfeger, and needed to "end things once and for all." (Filing No. 97-1 at 2, 15, 34.) This cannot be read as anything other than Harnishfeger's disdain for these callers and a rejection of their disturbing fantasies. The book in no way condones these behaviors.

The Court finds that Kopczynski's reasoning for her determination that Harnishfeger exhibited a lack of judgment—which ostensibly served as a major consideration in her removal—mischaracterizes the facts and evidence in the record. Harnishfeger did not share publication of *Conversations* on her Facebook page knowing that her supervisor at the National Guard had access to her profile, as Kopczynski seems to imply (*see* Filing No. 100 at 13). The publication announcement for *Conversations* occurred prior to Harnishfeger joining the VISTA Program (Filing No. 99-4 at 2), her placement with the National Guard (Filing No. 97-1 at 4), and Butler's request to add her as a friend and subsequent search through Harnishfeger's previous posts (Filing No. 99-3 at 23–25). Likewise, Harnishfeger's decision to identify herself on her Facebook page as a National Guard employee and her communication with community partners on two occasions via the Facebook page, occurred *after* she shared a link to *Conversations* in June 2016 (Filing No. 97-1 at 6).

 "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state

interest." *Craig*, 736 F.3d 1110 at 1119 (quoting *Rankin*, 483 U.S. at 388).  In this case, Kopczynski does not demonstrate that *Conversations* caused any interference with the work of the National Guard, any personnel relationships, or Harnishfeger's performance as a VISTA volunteer. Kopczynski stresses that she and at least two other National Guard employees—Butler and the other employee with whom Butler discussed *Conversations*—personally found the book objectionable.  But the Court agrees with Harnishfeger that Butler and the other employee cannot exercise "veto power by the mere fact that they voiced a complaint." (Filing No. 101 at 9.)

Kopczynski's "legitimate concerns" that the National Guard's community partners would discover *Conversations* is unsupported by the evidence in record.  The record instead demonstrates the considerable efforts Harnishfeger undertook to not link her real identity to the authorship of *Conversations* (Filing No. 99-3 at 22–23, 30).  Further, the fact that her Facebook page was set to private significantly limited the ability of Harnishfeger's post to be shared widely (*see* Filing No. 101 at 13 n.4).  Ultimately, Kopczynski's stated concerns are undercut by the conclusion of the Seventh Circuit that "*Conversations* neither promotes violence nor discourages victims of violence from seeking help."  943 F.3d 1105 at 1118.

The Seventh Circuit held that a "stronger showing [of disruption or potential disruption] may be necessary when an employee's speech more substantially involves matters of public concern."  *Craig*, 734 F.3d at 1119.  Because *Conversations* has been deemed speech on a matter of public concern, Kopczynski's burden to demonstrate that the book either disrupted the workplace or had the potential to do so is higher.  *See Waters v. Churchill*, 511 U.S. 661, 674 (1994) ("In many such situations the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished.").  Kopczynski does not meet that burden.

Kopczynski's contentions of actual disruption in the form of Butler and the other National Guard employee dropping "everything and report[ing] it up the supervisory chain," did not remotely threaten the effective and efficient fulfillment of the National Guard's responsibilities to the public. *See* 461 U.S. at 150. Although Butler and others reported their findings to their supervisor, Kopczynski admits the impact of learning of *Conversations* was brief and she could not point to any actual incidents in which the book proved disruptive (Filing No. 97-2 at 43). Kopczynski admits in her deposition testimony that she did not read the twenty-page *Conversations* in full prior to making her decision to terminate Harnishfeger and instead merely "skimmed" the text to "get the gist," before inquiring about removal options. *Id.* at 40, 46. Kopczynski had already decided Harnishfeger could not remain at the National Guard after her incomplete assessment of the book and before any attempts were made to speak with Harnishfeger. *Id.* at 44. The Court finds that Kopczynski's incomplete "investigation" of *Conversations* does not support the reasonableness of her belief that the book would cause future disruption. Kopczynski acted unreasonably in her decision to skim a brief employee-authored book in lieu of reading and appraising the text in full before making a consequential employment decision against that employee based on the content of said text. *See Waters*, 511 U.S. at 677 (holding "it may be unreasonable for an employer to act based on extremely weak evidence when strong evidence is clearly available.").

Kopczynski could name no specific incidents where the book proved disruptive. She concedes that she was unaware of any specific organizations declining to partner with the National Guard because of the book and unaware of any individual declining to make use of the National Guard's resources because of the book (Filing No. 97-2 at 43). In the three months Harnishfeger was in her placement, Kopczynski had no knowledge of *Conversations* affecting the National

Guard in any way.  *Id*. 42.  "If an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with a certain amount of care."  511 U.S. at 677.  Kopczynski did not exercise the requisite level of care here and she did not articulate a reasonable belief in future disruption that could be caused by *Conversations*.  The Court determines Kopczynski does not demonstrate that *Conversations* would create problems in maintaining discipline or harmony among co-workers.  This factor weighs in Harnishfeger's favor.

**b.    Whether the employment relationship is one in which personal loyalty and confidence are necessary**

Harnishfeger asserts that Kopczynski does not advance an argument that this factor weighs in her favor (Filing No. 101 at 18).  Harnishfeger argues that the clerical nature of her work, the fact that she had no regular in-person contact with members of the public or with the National Guard's partner organizations, and her minimal contact with the public at-large, "minimizes the governmental interest in suppressing her speech."  *Id*.  The Court agrees.

While Kopczynski does not directly address this factor, she does direct attention to the evidence in the record addressing the nature of Harnishfeger's position with the Family Program Office which had the potential to include attending events with community partners and permanent National Guard employees (Filing No. 100 at 13–14; Filing No. 102 at 3).  This fact, however, does not support the second factor in this inquiry weighing in Kopczynski's favor.

"The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails."  *Rankin*, 483 U.S. at 390.  The Seventh Circuit's determination remains applicable here: "Harnishfeger's responsibilities with the Guard were so routine and clerical that she could not be viewed by a reasonable member of the public as speaking for the Guard on any matter, beyond her occasional collection of

18

telephone numbers and email addresses from veterans' service providers." 943 F.3d at 1117. Harnishfeger's role—despite occasional outreach and the potential to attend events–was not meaningfully in the realm of the "confidential, policymaking, or public contact," and the danger to the National Guard's successful functioning from Harnishfeger's private speech was minimal. This factor weighs in Harnishfeger's favor.

### c.    **Whether *Conversations* impeded Harnishfeger's ability to perform her responsibilities**

Kopczynski asserts that Harnishfeger's speech raised a legitimate concern that she would be unable to perform her job duties (Filing No. 100 at 17). However, she mistakenly concludes that the content of *Conversations* "encouraged or condoned violence and sexual abuse against children." *Id.* The Court disagrees with Kopczynski's contention that *Conversations* demonstrated disdain for a group of people that the Family Program Office served—either children or victims of sexual or domestic violence—as there is no evidence in the record to support this belief. Despite Kopczynski's assertion that it would not be "rank speculation" for her to believe that *Conversations* and Harnishfeger's Facebook post announcing its publication would be detrimental to the Family Program Office's mission, Kopczynski does not provide evidence to support this belief. The same goes for her opinion that the book and social media post demonstrated a character trait that made Harnishfeger a poor fit for the position. Nothing in the record supports either of these contentions. *See Dorsey*, 507 F.3d at 627 (finding "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."). As held by the Seventh Circuit in this case,

> [T]here is in Harnishfeger's case no evidence and no basis for believing that veterans or organizations serving them would distrust the Guard if the known author of a phone-sex memoir were permitted to collect and enter the organizations' contact information into a database on the Guard's behalf. That is all the more true of *Conversations* specifically, which disapproves sexual abuse of children in the

strongest terms, describing those who fantasize about it as "monsters" who "need to end things once and for all."

943 F.3d at 1118.

The Court finds Kopczynski's reliance on *Craig* and the similar assorted cases cited involving law enforcement officials and other public-facing employees misplaced, as the Seventh Circuit has distinguished the facts at bar with those in *Craig*. *See* 943 F.3d at 1118–19. As noted by Harnishfeger, it is undisputed that she was not "in any way *actually* hindered in her ability to perform data entry or to complete the ministerial tasks that she had been assigned." (Filing No. 101 at 19 (emphasis in original).) In the three months she worked as a VISTA volunteer at the National Guard, there is no evidence that Harnishfeger's responsibilities and performance was hampered by her speech and Kopczynski admits there was no way in which the book affected the National Guard (Filing No. 97-2 at 42). In short, the record is devoid of evidence supporting the argument or inference that *Conversations* impeded Harnishfeger's abilities to perform her responsibilities as a VISTA volunteer. The Court determines that this factor weighs in favor of Harnishfeger.

### d.   The time, place, and manner of the speech

Harnishfeger argues that the "timing and nature" of her speech rendered the potential for disruption in the workplace "fanciful" because *Conversations* was authored prior to her employment with the National Guard and was in no way connected to her position or service (Filing No. 98 at 23). Kopczynski seemingly argues that by virtue of *Conversations* being announced via a social media post, it was more susceptible to being amplified and shared to others (Filing No. 100 at 19). In support of her contention, Kopczynski asserts that the Facebook post was easily located by Harnishfeger's supervisor and Harnishfeger's profile identified her as working with the National Guard. *Id.*

A review of the record supports that *Conversations* was published in Harnishfeger's role as a private citizen, it was written and distributed before she began her placement with the National Guard, and it did not concern her public employment position whatsoever. *See* 943 F.3d at 1114. The Court agrees with Harnishfeger that the time, place, and manner of her speech do not support Kopczynski's actions and weighs in her favor.

### e.    The context in which the underlying dispute arose

Kopczynski's argument concerning this factor—the context in which the underlying dispute arose—repurposes this factor as "the context in which the speech was made," and centers on the position that Harnishfeger's speech had the potential to harm the population served by the National Guard Family Program Office (Filing No. 100 at 19). This position is untenable because it incorrectly reframes the specific factor, and the prediction of potential harm is not supported with an evidentiary foundation. *See Craig*, 736 F.3d at 1119 ("But an employer's assessment of the possible interference caused by the speech must be reasonable—the predictions must be supported with an evidentiary foundation and be more than mere speculation.") (internal quotation marks and citations omitted). Kopczynski argues that there were other volunteer positions which Harnishfeger could have chosen that did not involve serving families and children (Filing No. 100 at 19). This is true, however, it does not support this factor weighing in Kopczynski's favor. Harnishfeger's articulation of the proper function of this factor is well-taken:

> This fifth factor—the "context in which the underlying dispute arose"—is designed to account for the self-evident proposition that speech otherwise unlikely to affect the workplace might nonetheless do so when it is part of a persistent dispute between an employer and an employee.

(Filing No. 101 at 23).

As noted in *Connick*, this factor is "significant," however, it has a specific purpose related to ongoing disputes in the competing employee-speech interests and employer-efficiency interest

context and in this case, there was no continuing dispute involving Harnishfeger's speech. *Connick*, 461 U.S. at 153 ("When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office."). Harnishfeger's speech did not involve the National Guard, the Family Program Office, or any other aspect of her public employment position in a persistent dispute. The Court finds that insofar as this factor is applicable, it weighs in Harnishfeger's favor because there was no underlying dispute at issue concerning Harnishfeger's speech.

> **f.    Whether the matter was one on which debate was vital to informed decision-making**

Kopczynski acknowledges that *Conversations* has "been afforded First Amendment protection," but argues that it was not speech "that was vital to informed decision-making about issues of public concern." (Filing No. 100 at 20.) She asserts that *Conversations* "does not involve a matter of social or political protest, for which opinion-sharing is vital to robust employee debate or public discourse." *Id.* Kopczynski argues that issues like violence and abuse of children is already widely acknowledged as being wrong, and the deplorable working conditions of phone-sex operators is uncontroversial. She asserts that "federal courts have suggested that comments that have no connection to the government employee's workplace arguably receive less First Amendment protection under the *Pickering* balancing test for government employees." *Id.* (citing *Grutzmacher v. Howard Cty.*, 851 F.3d 332 (4th Cir. 2017). She contends this factor does not weigh in Harnishfeger's favor. *Id.* at 21. The Court disagrees.

Harnishfeger asserts that her book advances public debate on the dangers of sexual predators and provides valuable information about the nature of the phone-sex industry (Filing No. 98 at 23). She asserts that as a former phone-sex operator, she has a "unique perspective" of the

dangers of the industry and sexual predation. *Id*. at 24. She argues that like the plaintiff in *Pickering*, her background and perspective place her as a member of the class "most likely to have informed and definite opinions" on the issue. *Id*. (citing 391 U.S. at 571-72). Harnishfeger rejects Kopczynski's reference to *Grutzmacher,* arguing that the Fourth Circuit's observation in that case—that speech involving only personal grievances rather than matters of public concern do not implicate *Pickering*—does not apply here because it has already been established that Harnishfeger is entitled to *Pickering* balancing (Filing No. 101 at 25 n.9).

Kopczynski's contention that because Harnishfeger's speech does not involve sociopolitical protest it should be afforded less First Amendment protections is unsupported by relevant case law. In *Grutzmacher*, the Fourth Circuit sought to differentiate speech on a matter of public concern with speech made purely upon matters of personal interest, which were not afforded constitutional protection. *Grutzmacher*, 851 F.3d at 343 ("Conversely, [i]n the absence of unusual circumstances, a public employee's speech upon matters *only* of personal interest is not afforded constitutional protection.") (internal quotation marks and citations omitted) (emphasis added). *Conversations* has already been deemed speech on a matter of public concern and acknowledged by both parties as being entitled to *Pickering* balancing.

The Court disagrees with Kopczynski and finds that despite its admittedly "disturbing" content, *Conversations* does involve matters for which opinion-sharing is vital to robust public discourse surrounding the phone-sex industry, sex workers, and sexual predation generally. Therefore, this factor of the inquiry weighs in Harnishfeger's favor.

### g. Whether Harnishfeger should be regarded as a member of the general public

Harnishfeger asserts that she clearly should be regarded as a member of the general public because, as explained by the Seventh Circuit, *Conversations* was unrelated to the VISTA Program,

the National Guard, or CNCS, and she never deliberately linked the book to her VISTA service (Filing No. 101 at 26) (citing 943 F.3d at 1114).  Further, Harnishfeger reiterates that nothing in *Conversations* or its distribution was linked to the National Guard's mission, purpose, or image, and she could not be viewed by a reasonable member of the public as speaking for the organization. *Id.* (citing 943 F.3d at 1115, 1117).  Kopczynski does not address this factor and whether it weighs in her favor.  The Court determines that Harnishfeger should be regarded as a member of the public and this factor weighs in her favor.

> 2.      **The *Pickering* Balancing Does Not Weigh in Kopczynski's Favor**

As noted by the Seventh Circuit, the "challenge in public-employee speech doctrine is "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  943 F.3d at 1115 (quoting *Pickering*, 391 U.S. at 568, 88).  Following the Court's analysis of the seven factors to consider in balancing Harnishfeger's First Amendment interests and the National Guard's interest in promoting efficient and effective public service, the Court determines that the *Pickering* balancing does not weigh in Kopczynski's favor.

The evidence demonstrates there was no actual or potential disruption caused by *Conversations* and the stated beliefs and justifications provided by Kopczynski for terminating Harnishfeger based on her speech on matters of public concern was unreasonable.  *Connick*, 461 U.S. at 154 (articulating the Court's "long-standing recognition that the First Amendment's primary aim is the full protection of speech upon issues of public concern").  Kopczynski violated the First Amendment when she removed Harnishfeger from her placement because of *Conversations*.  The

Court finds no genuine issue of material fact in dispute and **grants** summary judgment on Harnishfeger's First Amendment claim against Kopczynski.

**B.    Qualified Immunity**

Kopczynski argues, in the alternative, that she is entitled to qualified immunity (Filing No. 100 at 21).  "In determining qualified immunity at the summary judgment stage, the court asks two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Kristofek*, 832 F.3d at 798 (quoting *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 648 (7th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The Seventh Circuit holds, "[G]overnment officials are not expected to be prescient and are not liable for damages simply because they legitimately but mistakenly believed that the balancing of interests tipped in the State's favor." *Gregorich v. Lund*, 54 F.3d 410, 415 (7th Cir. 1995). However, the conclusion reached by the Seventh Circuit in this case remains appropriate at this stage even with a further developed record:

> No prescience is demanded, however, of the public employer who retaliates against protected speech "where the speech caused no actual disruption of any kind for four months, and where the employer neither articulates a belief that the speech has the potential to be disruptive in the future, nor has evidence to support the reasonableness of such a belief." *Gustafson v. Jones*, 290 F.3d 895, 913 (7th Cir. 2002) (rejecting defense of qualified immunity on appeal from verdict for plaintiffs). Substitute "three months" for "four months," and the observation applies here.

*Harnishfeger*, 943 F.3d at 1120.

Kopczynski correctly asserts that "'clearly established law' cannot be defined at a high level of generality; instead, the law must be 'particularized' to the facts of the case." (Filing No. 100 at 23) (quoting *White v. Pauly*, 137 S. Ct. 548, 552, 196 L. Ed. 2d 463 (2017)).  However, she argues that because she could identify no cases concerning: "the right to self-publish a book of such

graphic nature as *Conversations with Monsters*, post[ing] the book to a Facebook page, us[ing] that same Facebook page to communicate on behalf of a Government organization to community partners, and identify[ing] oneself on that page as working for the organization," she should be entitled to qualified immunity (Filing No. 100 at 23).   The Court disagrees with Kopczynski's contention which essentially posits that unless the very same activity at issue has already been deemed unlawful, then qualified immunity must apply.   *See Wilson v. Layne*, 526 U.S. 603, 615 (1999) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful[]").   The Supreme Court holds that "clearly established law" in the qualified immunity context, "means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."   *Id*. (internal quotation marks omitted).

Kopczynski asserts that the Seventh Circuit's decision on appeal in this case "cannot be the basis for 'clearly-established law' at the time she made her removal decision," because it was made "well after" the fact (Filing No. 100 at 23).   However, it is not the Seventh Circuit's *Harnishfeger* decision that forms "clearly established law" in this case.   As correctly noted by Harnishfeger, the Seventh Circuit determined that "the law was *already* clearly established as of September 2016." (Filing No. 101 at 29.) Specifically,

> [T]he issue is whether any employer could have thought it was entitled to punish an employee for speech on a matter of public concern where the speech caused no actual disruption of any kind for four months, and where the employer neither articulates a belief that the speech has the potential to be disruptive in the future, nor has evidence to support the reasonableness of such a belief. We need look no further than *Connick* to know that the answer to that question is no.   The law to that extent was clearly established[].

*Gustafson*, 290 F.3d at 913.   Like the Seventh Circuit determined in *Gustafson*, "the key elements of this case have been clear for years: a public employer may not retaliate against an employee

who exercises his First Amendment speech rights." *Id*. at 912. The law with respect to both Harnishfeger's speech on a matter of public concern and the anti-retaliation elements of her claims was "well established." *Id*. at 913.

Harnishfeger has shown that Kopczynski terminated her for protected speech on a matter of public concern in violation of the First Amendment. As determined by the Seventh Circuit, "under clearly established law in September 2016, *Conversations* was protected," and "clearly established law in September 2016 held that the public employer's side of the *Pickering* balance must be supported with evidence of actual disruption, or at least the articulation of a *reasonable* belief in future disruption plus evidence of its reasonableness at the time." 943 F.3d at 1121 (emphasis added); *see also* 290 F.3d at 913.

The *Pickering* balance analysis shows there was no actual disruption in this case. The Court determined that contrary to Kopczynski's claim, Butler and the other employee bringing *Conversations* to her attention does not suffice as actual disruption given that it in no way jeopardized the effective and efficient fulfillment of the National Guard's responsibilities to the public. *See Connick*, 461 U.S. at 150. Further, Kopczynski admitted in her deposition that she could name no specific incidents where the book proved disruptive. While Kopczynski articulates a belief in future disruption, the Court has determined that it was unreasonable because it was unsupported by an evidentiary foundation and it was neither clear nor obvious such disruption would occur. *See Greer*, 212 F.3d at 372-73 (determining an employer need not establish actual disruption when the threat of future disruption is "obvious" and "clear"). Although she has offered additional evidentiary basis to find in her favor, the evidence does not sufficiently support of the reasonableness of her belief that *Conversations* had the potential to be disruptive in the future. *See*

27

*Waters*, 511 U.S. at 673 (holding courts generally "grant substantial weight to government employers' *reasonable* predictions of disruption") (emphasis added).

Kopczynski's assertion that she believed that *Conversations* reflected negatively on the Family Program Office and would frustrate the mission of the office only offered a generalized potential for disruption that was primarily informed by her superficial review of the book and her misapprehension of the speech as condoning violence and sexual abuse of children. *Gustafson*, 290 F.3d at 911 ("[m]ere assertions of a generalized potential for disruption are in any event insufficient.").

Kopczynski maintains that she followed applicable policies and procedures before removing Harnishfeger and this should weigh in favor of qualified immunity. *See Wilson*, 526 U.S. at 617 (finding reliance on formal agency policies an important consideration in qualified immunity analysis). However, Kopczynski does not provide evidence that there existed a formal policy at the National Guard that permitted termination of an employee for past non-disruptive speech on a matter of public concern.  As noted by Harnishfeger, nor is it the case "where the National Guard had a formal policy prohibiting it employees from having, at any point in the past, made or publicized statements of a sexually graphic nature." (Filing No. 101 at 29.)  Kopczynski's reliance on such policies would undoubtedly be an important consideration if they existed but that is not the case here. Kopczynski's compliance with the formal policies for removal does not make reasonable belief that *Conversations* had the potential to be disruptive and does not justify her decision to remove Harnishfeger for past speech on a matter of public concern, unrelated to her public employment, and where no actual disruption was demonstrated. *See Wilson*, 526 U.S. at 617 (determining a formal agency policy and adherence to it, "could not make reasonable a belief that was contrary to a decided body of case law").

Kopczynski's deposition testimony, contemporaneous notes about Harnishfeger's removal, and her letter requesting Harnishfeger's removal, provide no meaningful support for the reasonableness of the belief that *Conversations* could potentially be disruptive or that it would detrimentally affect the "camaraderie and internal harmony" of the National Guard, ([Filing No. 102](#) at 4; *see generally* [Filing No. 97-2](#)); *see also Hulbert v. Wilhelm*, 120 F.3d 648, 655 (7th Cir. 1997) (illustrating that under *Connick* "mere incantation of the phrase 'internal harmony in the workplace' is not enough to carry the day"). The Court does not doubt that Kopczynski's believed multiple employees had become aware of the book and that the book was easy to access; however this belief is not supported by the evidence.  She could identify no other employees aside from Butler and the other employee who reported the book to her, and she does not dispute that Harnishfeger's "private" Facebook profile significantly limited access to the profile page and the ability to "share" its contents.  Ultimately, these claims do not support a reasonable inference of potential future disruption, not the least of which because *Conversations* did not condone violence and abuse of children.  *See* 943 F.3d at 1118 ("It borders on the fanciful to suggest, as defendants do here, that any member of the public could believe the Guard condoned sexual abuse of children because its VISTA volunteer authored *Conversations*.") (internal quotation marks and citations omitted).  On this record, Kopczynski's conclusions and beliefs about potential disruptions caused by *Conversations* were not reasonable and she did not provide adequate evidence of their reasonableness.

The facts make out a violation of Harnishfeger's First Amendment rights.  The issue of whether an employer could have thought it was permitted to punish an employee for speech on a matter of public concern—where the speech caused no actual disruption of any kind for three months, and where the employer did not articulate a reasonable belief that the speech had the

potential to cause future disruption, nor provided evidence to support the reasonableness of such a belief—has already been decided. *See Harnishfeger*, 943 F.3d at 1120; *see also Gustafson*, 290 F.3d at 913. The law to that extent was clearly established, and so Harnishfeger satisfies both prongs of the qualified immunity inquiry at summary judgment. *Kristofek*, 832 F.3d at 798.

Kopczynski is not entitled to qualified immunity on Harnishfeger's First Amendment claim.

**C.   Damages**

A lost-wages award "compensates an unlawfully discharged employee for the loss of earnings that [she] sustains as a result of the discharge." *Brown v. Smith*, 827 F.3d 609, 616 (7th Cir. 2016) (quoting *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 771 (7th Cir. 2006)). Harnishfeger argues that she is entitled to an award of special damages based on her lost wages before securing new employment, totaling $1,152.91 (Filing No. 98 at 27). Specifically, she seeks compensatory damage of $1,152.91 because she was "out of work for forty days" and did not receive a VISTA living allowance during this time period. *Id.*

Kopczynski raises the affirmative defense of failure to mitigate damages. (Filing No. 73 at 7). She contends that Harnishfeger's deposition testimony and Facebook messages to her daughters —"so I have to try to get a job with them and then prove they dont' [sic]want me" (Filing No. 99-10) -- reveals that she only applied to five positions on the advice of her attorney because "I have a duty to try to mitigate my circumstances, is what he said," and "my lawyer wants me to apply for 5 positions with VISTA so they can turn me down." *Id.* Kopczynski argues that Harnishfeger never intended to accept any position she was offered and points to evidence that Harnishfeger was contacted by the IU School of Public Health expressing an interest in offering her a position, however, Harnishfeger did not respond or read the materials she was sent (Filing

No. 99-11). Kopczynski also draws attention to the fact that another organization considered selecting Harnishfeger, and she chose not to respond (Filing No. 102 at 13).   Kopczynski points out that Harnishfeger applied for and accepted outside employment with Centerstone on October 4, 2016, almost one month before her removal from the VISTA Program (Filing No. 100 at 25). Kopczynski contends this evidence shows that Harnishfeger did not make a good-faith attempt to secure another volunteer position with the VISTA Program (Filing No. 100 at 25).

In her reply, Harnishfeger states that Kopczynski does not dispute the amount of the special damages owed but rather she makes an unsupported argument that Harnishfeger should not be entitled to these damages (Filing No. 101 at 30).   She asserts that Kopczynski cites no legal authority to support her argument that she is entitled to summary judgment on her failure-to-mitigate defense, and this should constitute waiver.   fails to address her burden in advancing a failure-to-mitigate defense. *Id*.   She disputes Kopczynski's interpretation of what the evidence shows and contends that employment with a different sponsor organization would not have been comparable with the National Guard, because jobs are simply not fungible. *Id*. at 33.   She argues the evidence does not demonstrate that Harnishfeger either failed to exercise reasonable diligence or that she might have found comparable work had she done so.   *Id*. at 32.

"The employer generally bears the burden of proving a failure to mitigate." *Brown*, 827 F.3d at 616.   To prevail on a failure-to-mitigate defense, "the employer must prove *both* that the [claimant was] not reasonably diligent in seeking other employment, *and* that with the exercise of reasonable diligence there was a reasonable chance that the [claimant] might have found comparable employment." *U.S. E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990) (internal quotation marks and citations omitted) (emphasis in original).   As noted by our sister court, a plaintiff's "duty to mitigate his damages is not met by using reasonable diligence to obtain

31

any employment, rather the employment must be comparable employment." *Moore v. Univ. of Notre Dame*, 22 F. Supp. 2d 896, 906 (N.D. Ind. 1998). Comparable employment has been held by this Court and defined by the Seventh Circuit as, "a position that affords 'virtually identical promotional opportunities, compensation, job responsibilities, working conditions[,] and status' as the previous position." *Freese v. Honda Mfg. of Indiana, LLC*, No. 1-18-cv-04016-JMS-MPB, 2020 WL 3473450, at *16 (S.D. Ind. June 25, 2020) (quoting *Moore*, 22 F. Supp. 2d at 906); *see also Hutchison*, 42 F.3d at 1044.

The evidence in the record demonstrates that Harnishfeger began to look for new employment once it became clear that she would no longer remain in her placement at the National Guard (Filing No. 99-13).   However, Harnishfeger's deposition testimony also shows that she disclosed the nature of her removal from the National Guard each time she applied to a new position, and she was deterred from seeking certain placements in the VISTA Program because of the stigma of *Conversations* and her termination. And her Facebook communications with her daughters presents evidence that Harnisfeger was only pretending to mitigate damages while not actually intending to do so. The Court finds there is a genuine dispute of material facts concerning Kopczynski affirmative defense that Harnishfeger did not exercise reasonable diligence to mitigate her damages.  Accordingly, summary judgement is **denied** on the issue of compensatory damages and this issue should be decided by the trier of fact.

## IV.    CONCLUSION

For the reasons explained above, the Court **GRANTS** in part and **DENIES** in part Harnishfeger's Motion for Partial Summary Judgment, (Filing No. 97). Partial summary judgment is **granted** on the issue of liability but **denied** on the issue of compensatory damages. Harnishfeger's claims for compensatory damages and damages for emotional and related harm

must be resolved by settlement or at trial. The Court **DENIES** Kopczynski's Motion for Summary Judgment (Filing No. 99) on the issue of liability and determines that Kopczynski violated Harnishfeger's First Amendment rights and  Kopczynski is not entitled to qualified immunity.

The parties are directed to contact the Magistrate Judge to schedule a settlement conference, and if settlement fails, parties shall determine case management deadlines so that a trial date can be scheduled.

     **SO ORDERED**.

Date:  3/29/2022

                                                 Hon. Tanya Walton Pratt, Chief Judge
                                                 United States District Court
                                               Southern District of Indiana

DISTRIBUTION:

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov